IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WILDEARTH GUARDIANS,

      Plaintiff,

v.                              No. 1:19-cv-00505-RB-SCY

DAVID BERNHARDT, *et al*.,

      Defendants,

and

AMERICAN PETROLEUM INSTITUTE,
and WESTERN ENERGY ALLIANCE,

      Intervenor-Defendants.

## MEMORANDUM OPINION AND ORDER

In the last decade, New Mexico has emerged as one of the largest oil and gas producers in the United States. With production levels at one million barrels per day, the state now generates more oil than OPEC member countries Ecuador, Equatorial Guinea, and Gabon combined.[1] Such rapid development, however, naturally raises questions about the collateral environmental impact. Much of this growth in southeastern New Mexico has taken place on federal land. The Bureau of Land Management (BLM) is responsible for leasing the land to oil and gas companies. BLM's leasing process requires voluminous documentation and must comport with the National Environmental Policy Act (NEPA) and its implementing regulations.

In 2017 and 2018, BLM approved three separate leases for oil and gas development in the Carlsbad and Permian Basin regions of southeastern New Mexico. Plaintiff WildEarth Guardians

---

[1] *See* Simon Romero, *New Mexico's Oil Boom: Bounty for One of the Country's Poorest States*, N.Y. Times (Oct. 29, 2019), https://www.nytimes.com/2019/10/27/us/new-mexico-oil.html.

(WildEarth) is a non-profit organization focused on environmental protection and advocacy. WildEarth filed suit against Defendant Secretary of the Interior, David Bernhardt, in his capacity as head of BLM. In an earlier Memorandum Opinion and Order, the Court allowed the American Petroleum Institute (API) and Western Energy Alliance (WEA)—both oil and gas industry trade organizations—to join as intervenor-defendants in the suit. (*See* Doc. 36.) WildEarth contends that BLM did not follow the appropriate procedures and perform adequate analyses before issuing the three leases. Specifically, WildEarth argues that BLM did not account for the cumulative environmental effects of existing development in the region and failed to frame these three leases within the broader global climate crisis. As a result, WildEarth requests that BLM's Leasing Authorizations be vacated.

After considering the parties' briefs and the extensive administrative record, the Court recalls the final chapter of Rachel Carson's seminal *Silent Spring*, where she warns that we stand at a fork in the road. One path leads toward environmental intervention; the other toward the status quo. *See* Rachel Carson, *Silent Spring* 277 (First Mariner Books ed., 2002). However dire this fork might seem, only policymakers are empowered to choose which of these two paths to take. The Court's role is simply to ensure that once that decision is made, the parties stay within the guardrails of the chosen path. Under the Administrative Procedure Act (APA), the Court largely defers to agency decisionmaking, and NEPA does not require that BLM perform specific tests to measure environmental impact. As such, the Court will deny in part WildEarth's Motion for Vacatur.

## I.    Background

WildEarth is a non-profit organization based in Santa Fe, New Mexico. (Doc. 31 (Am. Compl.) ¶ 14.) The group advocates on behalf of the environment and seeks to "restore the wildlife,

wild places, wild rivers, and health of the American West." *Mission, Vision, and History*, WildEarth Guardians, https://wildearthguardians.org/about-us/mission-vision-history/ (last visited July 28, 2020). The group includes over 231,000 members, some of whom live and work in the Greater Carlsbad region. (Am. Compl. ¶ 14.) Members "regularly use and enjoy the wildlands, wildlife habitat, rivers, streams, and healthy environment" on public land in New Mexico. (*Id.* ¶ 15.) They "derive recreational, inspirational, scientific, educational, and aesthetic benefit from their activities on lands covered by the leases . . . ." (*Id.*)

Defendant David Bernhardt is the United States Secretary of the Interior and oversees BLM's practices. (*Id.* ¶ 22.) BLM "is responsible for managing public lands and resources in New Mexico, including federal onshore oil and gas resources and the leasing program for those resources." (*Id.* ¶ 23.)

On February 11, 2020, the Court granted intervention of two additional parties. (*See* Doc. 36.) API is a trade group for the oil and gas industry. It "represents all segments of America's oil and natural gas industry." *Who We Are*, Am. Petroleum Inst., https://www.api.org/about (last visited July 10, 2020). API's more than 600 members produce most of the nation's energy. (*See* Doc. 12 at 2.) API advocates on behalf of the industry before local, state, and federal governments, offers research and analysis, and sets standards for oil and gas development. (*See id.*)

WEA is a trade group representing 300 companies "engaged in all aspects of environmentally responsible exploration and production . . . of oil and natural gas in the West." *About the Alliance*, W. Energy Alliance, https://www.westernenergyalliance.org/about.html (last visited July 28, 2020). WEA member companies are "independent oil and gas producers, the majority of which are small businesses with an average of fourteen employees." *Id.* Specifically,

WEA represents the "'upstream' segment of the industry." *Id.* Similar to API, WEA engages with all levels of government on behalf of its clients. *See id.*

### a.   BLM's Oil and Gas Leasing Practices

BLM oversees the administration and use of public lands. BLM "manages onshore oil and gas development through a three-phase process." (Am. Compl. ¶ 55.) First, BLM is required to prepare a resource management plan to project "present and future use of public lands and their resources by establishing management priorities, as well as guiding and constraining BLM's implementation-stage management." (*Id.* ¶ 56 (citing 43 C.F.R. § 1600).) The resource management plan denotes which land "containing federal minerals will be open to leasing for oil and gas, and under what general conditions, and must analyze the landscape-level impacts from predicted future development." (*Id.*)

Second, BLM identifies land to be offered for sale based on "competitive bidding." *See* 43 C.F.R. § 3120.1-1. Before January 31, 2018, BLM's leasing process, outlined in Instruction Memorandum No. 2010-117 (IM 2010-117), was lengthier than its current version. (Doc. 37-1 (Administrative Record (AR) at 012103.) Instruction Memorandum No. 2018-034 (IM 2018-034) replaced and amended the previous guidance. (AR at 012478.) Under IM 2010-117, local offices would draft a schedule to review leasing plots with no specific review timeline (AR at 012103), but IM 2018-034 limited this process to six months. (AR at 012478.) IM 2010-117 stated that the public "*will*" participate in the review process (AR at 012105), but IM 2018-034 only holds that the public "*may*" participate (AR at 012479). The new guidance cut the public notification period for the lease sale in half from 90 to 45 days. (AR at 012479–80.) Additionally, IM 2018-034 created exceptions that limit the amount of documentation needed to move forward with a lease sale when its impact is minimal. (AR at 012479.) After lease sales are made, individuals and

organizations have a protest period to contest the sales. (AR at 012480.) IM 2018-034 shortened this period from 30 days to 10 days. (*See id.*)

Lastly, oil and gas companies must submit an application for permit to drill (APD) to BLM. *See* 43 C.F.R. § 3162.3-1(c). BLM states that local field offices are charged with conducting the NEPA review and collecting public comments. (Am. Compl. ¶ 60.) The third phase occurs once BLM issues the lease. (*Id.* ¶ 66.) The "lessee is required to submit an application for permit to drill . . . to BLM prior to drilling." (*Id.* ¶ 66.) Once it reviews the APD, BLM may then impose reasonable conditions on the lessee prior to approval. *See* 43 C.F.R. § 3101.1-2.

### b.  BLM's Challenged Leasing Decisions

WildEarth filed suit against BLM for approving certain oil and gas leases across more than 68,232 acres of public land in southeastern New Mexico. (Doc. 1 (Compl.).) WildEarth contends that approval of these leases contravenes NEPA, the Federal Land Policy and Management Act (FLPMA), and the APA. (*Id.*) Generally, WildEarth claims that BLM failed to adequately assess the environmental impact of cumulative oil and gas development. (Am. Compl. ¶ 256–88.)

### i.  September 2017 Lease Sale

On November 21, 2016, BLM provided a list of 52 potential parcels of land for the September 2017 lease sale. (*Id.* ¶ 148.) BLM issued a lease sale notice and draft environmental assessment (EA), which initiated the 30-day protest period. (AR at 002561.) An EA is a document analyzing the environmental impact of an agency's action. WildEarth filed its administrative protest on July 6, 2017. (AR at 002619.) Two months later, BLM sold 61 of the 62 parcels, for a total of 15,331.91 acres. (AR at 002634.) BLM denied WildEarth's protest and issued the leases. (AR at 002758.) But on September 24, 2019, "BLM's counsel informed [WildEarth's] counsel that 18 of the 61 issued leases had been subsequently cancelled." (Am. Compl. ¶ 156 (citing Doc.

29-1).) As a result, WildEarth "voluntarily dismissed these cancelled parcels from this litigation, subject to BLM's stipulation that the agency will prepare a new NEPA-compliant EA prior to any of the cancelled parcels being reinstated." (*Id.*)

### ii. December 2017 Lease Sale

On July 10, 2017, BLM listed seven potential parcels in the Carlsbad region for the December 2017 lease sale. (AR at 001510.) BLM began the same process with other parcels in the area. (AR at 001422.) Again, WildEarth filed an administrative protest. (AR at 001494.) The sale occurred on December 7, 2017, and BLM leased seven parcels amounting to 2,104.15 acres. (AR at 001508.) BLM denied WildEarth's protest and proceeded with the sale. (AR at 001586.)

### iii. September 2018 Lease Sale

Finally, on April 3, 2018, BLM listed 197 potential parcels for the September 2018 lease sale. (AR at 006356.) BLM issued a notice—this time beginning a 10-day protest period per IM 2018-034. (*See id.*) WildEarth again filed an administrative protest within the shorter timeframe. (AR at 005849.) On September 5 and 6, 2018, BLM held the sale, offering 142 parcels or about 76,219.5 acres of land. (AR at 006446.) As with the other sales, WildEarth's protest was denied. (AR at 006611.)

### c. WildEarth Member Activities in the Greater Carlsbad Region

WildEarth seeks organizational standing in this matter to challenge the leases and IM 2018-034 generally. It submitted declarations from three of its members explaining their relation to the land at issue. (*See* Docs. 35-1; 35-2; 35-3.) First, Nathalie Eddy currently lives in Leadville, Colorado and is a WildEarth member. (Doc. 35-1 ¶ 2.) She believes in WildEarth's mission, and since 2017 has worked "as the Oil and Gas Field Advocate for Earthworks, an environmental non-profit organization dedicated to protecting communities and the environment from the adverse

impacts of mineral and energy development while promoting sustainable solutions." (*Id.* ¶ 5.) One of her primary areas of focus is the Greater Carlsbad region. (*Id.*) She aims to "gain a better understanding of what's really happening on the ground in terms of emissions of air pollutants and to help inform the community . . . ." (*Id.* ¶ 7.) Eddy has "regularly visited" the land where the parcels are located, beginning in March 2018. (*Id.* ¶ 13.) On August 5–7, 2019, Eddy "visited the area" and worked "with local communities seeking to engage in a public consultation process for proposed new state regulations governing methane releases . . . ." (*Id.* ¶ 14.) In November 2019, she made another visit to conduct "fieldwork" and to attend "community meetings in Carlsbad and Hobbs." (*Id.* ¶ 15.) Further, Eddy has definite plans to return in "early March and again in mid-April for additional fieldwork[] and intend[s] to return to the region at least quarterly" for the foreseeable future. (*Id.* ¶ 16.) She claims that "it is impossible not to notice the impacts of oil and gas development, which can be found across the landscape, although certainly more intensively in certain areas." (*Id.* ¶ 22.) Eddy claims that she is personally offended by the degradation of the landscape, "which detract[s] from the natural scenery of the region[] and decrease[s] [her] enjoyment of visiting this area." (*Id.*) Moreover, she claims that in certain areas, she has smelled "natural gas/hydrogen sulfide" and remains "concerned for [her] own health visiting these areas, and very worried about the long-term health consequences for the residents of the area." (*Id.* ¶ 26.)

Second, Rebecca Sobel is a 15-year resident of New Mexico and a member of WildEarth. (Doc. 35-2 ¶¶ 2–3.) She is WildEarth's Senior Climate and Energy Program Campaigner. (*Id.* ¶ 5.) Sobel advocates for "clean energy solutions that can help our society shift away from the use of fossil fuels and protect natural values and important resources from the impacts of fossil fuels and protect natural values and important resources." (*Id.*) She is familiar with the lease sales and has "regularly visited [the area] for recreational enjoyment since 2006." (*Id.* ¶ 10.) Sobel "specifically

visited BLM lands in [the Carlsbad region] in September 2006, September 2008, October 2011, August 2013, September 2016, June 2018, September 2018, and just recently in June, November, and December 2019." (*Id.*) In these areas, Sobel often "camp[s], hike[s], view[s] wildlife, and enjoy[s] the scenery." (*Id.* ¶ 11.) Sobel frequently visits the Guadalupe Mountains west of Carlsbad and "particularly enjoy[s] the scenery of the Pecos River." (*Id.* ¶ 13.) There, she says that "it is impossible not to notice the impacts of oil and gas development." (*Id.* ¶ 16.) "[I]t is always very noticeable and detracts from the natural beauty of the region." (*Id.*) Moreover, the "sights, sounds, and smells of oil and gas development detract from the natural scenery of the region, and decrease [her] enjoyment of hiking, camping, and viewing wildlife." (*Id.*) The presence of the oil and gas industry is "unavoidable in this region of southeastern New Mexico." (*Id.*) Byproducts of gas development include: "more truck traffic, drilling rigs sticking up from the land, smells, dust, and more industrialization." (*Id.*) From Sobel's perspective during recent trips, "the air was very hazy and polluted-looking as a result of oil and gas development." (*Id.* ¶ 20.)

In addition, Sobel specifically addresses the parcels at issue. Regarding the September 2017 lease sale, Sobel states that she visited the area "off of New Mexico Highway 137" "to hike, view wildlife, and enjoy the area's scenery in September 2008, August 2013, September 2016, and September 2018." (*Id.* ¶ 24.) She specifically visited parcels 1–9 to hike and observe wildlife. (*Id.* ¶ 25.) She visited land near parcels 17–20 and stepped foot on parcel 21. (*Id.* ¶ 26.) Sobel also "hiked, backpacked, and camped on much of the BLM land in the very southeastern corner of New Mexico near Jal, New Mexico and parcels 40, 44–54, and 58–62." (*Id.* ¶ 27.) Finally, she visited parcels 21, 24, and 25 in September 2008, October 2011, August 2013, September 2016, September 2018, and June 2019, and she intends to return to this area in October 2020. (*Id.* ¶ 28)

Regarding the December 2017 lease sale, Sobel visited the land in September 2008, October 2011, August 2013, and September 2016. (*Id.* ¶ 30.) This land is home to the Pecos River, which Sobel has kayaked on and hiked around. (*Id.*) Specifically, she has spent time on parcels 2–7, and she plans to return to the area in "the fall of 2020." (*Id.* ¶ 31.)

Sobel has also visited the land subject to the September 2018 lease sale. She hiked, viewed wildlife, and camped in this vicinity and spent time on parcels 3–19 and 22–27. (*Id.* ¶ 33.) She visited parcel 28 near Black River Village. (*Id.* ¶ 34.) "Many of these parcels are further west than most of the oil and gas development in the area, so the possibility of new oil and gas development on these leased parcels is particularly troubling . . . ." (*Id.* ¶ 33.) Other hiking and camping trips have brought Sobel to parcels 40–43, 54–57, and 71–74. (*Id.* ¶¶ 35–36.)

Finally, Rebecca Fischer is a WildEarth member currently residing in Edgewater, Colorado. (Doc. 35-3 ¶ 2.) She is a Climate and Energy Program Attorney for WildEarth. (*Id.* ¶ 5.) In this role, Fischer "educate[s] federal agencies on the full costs of federal oil and gas development in order to protect our climate, water, air, wildlife, and public health." (*Id.*) Fischer "travelled to southeastern New Mexico twice in the last two years, once in September 2018 and just recently in June 2019, to view the beautiful desert landscape and the species that inhabit it, hike, and generally explore." (*Id.* ¶ 12.) During these visits, Fischer "set foot on and viewed parcels offered for lease in many of the New Mexico BLM's lease sales, including the lease sales at issue in this case." (*Id.*)

### d.  WildEarth's Claims and Relief Sought

WildEarth brings forth multiple claims for relief. First, it alleges that BLM failed "to take a hard look at the environmental impacts of oil and gas development (BLM's violation of NEPA)." (Am. Compl. ¶ 292 (capitalization altered).) Because of this failure, "BLM's authorization of the

192 leases challenged herein is arbitrary, capricious, and [an] abuse of discretion, in excess of statutory authority and limitations, short of statutory right, and not in accordance with the law and procedures required by law." (*Id.* ¶ 297 (citing 5 U.S.C. §§ 706(2)(A), (C), (D)).)

Second, WildEarth alleges that BLM failed to provide a sufficient rationale justifying the decision not to prepare an environmental impact statement (EIS)—a detailed document outlining the environmental risks associated with the agency action. Specifically, BLM "failed to provide convincing statements of reasons justifying its decision to forgo an EIS analyzing the impacts of the 192 lease parcels challenged herein, as required by NEPA." (*Id.* ¶ 300 (citing 40 C.F.R. § 1508.27).) These leasing authorizations could have a significant impact on the environment, so the inability to support the decision to forgo the EIS constitutes arbitrary and capricious action. (*Id.* ¶ 304 (citing 5 U.S.C. §§ 706(2)(A), (C), (D)).)

Third, WildEarth states that BLM unlawfully issued the leases in the midst of a resource management plan review. (*Id.* ¶ 310.) This decision "could prejudice or limit the choice of alternatives in the broader EIS that will accompany the ongoing [resource management plan amendment]." (*Id.* ¶ 312.) Therefore, WildEarth alleges that BLM acted arbitrarily and capriciously, in contravention of the APA. (*Id.* (citing 5 U.S.C. §§ 706(2)(A), (C), (D)).)

Fourth, WildEarth argues that BLM unlawfully adopted IM 2018-034. (*Id.* ¶ 314.) In implementing the new guidance, BLM violated "the public participation requirements of FLPMA, and the implementing regulations of NEPA." (*Id.* (citations omitted).) Again, such behavior falls under the arbitrary and capricious standard of the APA. (*Id.* ¶ 328 (citing 5 U.S.C. §§ 706(2)(A), (C), (D)).)

Fifth, WildEarth claims that implementing IM 2018-034 is a violation of the "public notice and comment in agency rulemaking" provisions under 5 U.S.C. § 553. (*Id.* ¶ 330.) That is, "[b]y

10

failing to provide public notice or an opportunity for public comment before issuing IM 2018-034,

Defendants failed to observe procedures required by law, in contravention of the APA," rendering

BLM's actions arbitrary and capricious under the APA. (*Id.* ¶ 335 (citations omitted).)

Given BLM's alleged actions, WildEarth requests the following relief:

A. Declare that Defendants' Leasing Authorizations violate NEPA, FLPMA, the APA, and their implementing regulations;

B. Vacate and remand Defendants' Leasing Authorizations;

C. Enjoin Defendants from any further leasing authorizations within the Pecos District pending Defendants' full compliance with NEPA, FLPMA, the APA, and their implementing regulations;

D. Enjoin Federal Defendants from approving or otherwise taking action on any pending or future applications for permits to drill on the leases included in the lease sales challenged herein until Federal Defendants have fully complied with NEPA and its implementing regulations;

E. Declare that IM 2018-[034] is unlawful under FLPMA, NEPA, the APA, and their regulations, and reverse, set aside, and enjoin Defendants from continuing to implement IM 2018-034;

F. Enter such other declaratory and/or injunctive relief as [WildEarth] may specifically request hereafter;

G. Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein;

H. Award [WildEarth] its fees, costs, and other expenses as provided by applicable law; and

I. Grant [WildEarth] such additional and further relief as this Court may deem[] just, proper, and equitable.

(*Id.* at 93–94.) WildEarth filed its opening merits brief on February 7, 2020. (Doc. 35.) BLM filed

its Response on March 6, 2020 (Doc. 40), with accompanying responses from API (Doc. 38) and

WEA (Doc. 39).

## II.    Legal Standard

NEPA does not provide a private right of action, so challenges to agency actions are brought under the APA. *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1226 (10th Cir. 2011). Given that district courts are reviewing final agency decisions, the case is procedurally treated like an appeal. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). Under the APA, an individual "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. District courts can therefore "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(A), (C), (D). To determine whether an action is arbitrary and capricious, district courts take a "thorough, probing, in-depth review" of the administrative record that the parties provide. *Wyoming v. United States*, 279 F.3d 1214, 1238 (10th Cir. 2002) (quotation omitted); *Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision*, 934 F.2d 1127, 1137 (10th Cir. 1991). The Tenth Circuit has held:

> An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (quotation marks omitted) (quoting *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)). In sum, courts ask whether the agency took a "'hard look' at information relevant to the

decision." *Id.* (citing *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1178 (10th Cir. 2008)).

Courts have historically deferred to an agency's interpretation of a statute that the agency is tasked with enforcing. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). The Supreme Court has articulated a two-step process. First, courts ask whether the statutory language is clear. If so, the agency must follow the clear directive. If not, the second step asks whether the agency's interpretation of the statute is reasonable. *See id.* at 842–43. In NEPA cases, agencies must assess the environmental impact, but they "are not required to elevate environmental concerns over other valid concerns." *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1235 (10th Cir. 2016) (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1162–63 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003)) (subsequent citation omitted). As long as the environmental impact is sufficiently considered and "the record demonstrates that the agencies in question followed the NEPA procedures . . . , the Court will not second-guess the wisdom of the ultimate decision." *Id.* at 1236 (quoting *Utahns for Better Transp.*, 305 F.3d at 1163) (subsequent citation omitted).

III.    **BLM complied with NEPA when it took a hard look at how its Leasing Authorizations would cumulatively affect the regional and global environment, air quality, and water quality.**

NEPA's goal is, in relevant part, to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; [and] to promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ." 42 U.S.C. § 4321. It seeks to achieve this through "informed agency decisionmaking and public access to information." *Richardson*, 565 F.3d at 707 (citations omitted). Therefore, NEPA requires that agencies assess: "the environmental impact of the proposed action," "adverse environmental

effects[,]" "alternatives to the proposed action," "the relationship between local short-term uses of

man's environment and the maintenance and enhancement of long-term productivity," and "any

irreversible and irretrievable commitments of resources . . . ." 42 U.S.C § 4332(C).

      The agency must look at direct effects, or those "caused by the action and occur at the same

time and place." 40 C.F.R. § 1508.8(a). But it is also required to address indirect effects, or "growth

inducing effects and other effects related to induced changes in the pattern of land use, population

density or growth rate." *Id.* § 1508.8(b). Such effects are still "caused by the action and are later

in time or farther removed in distance, but are still reasonably foreseeable." *Id.* In addition, the

agency looks at cumulative impacts, which are "impact[s] on the environment which result[] from

the incremental impact of the action when added to other past, present, and reasonably foreseeable

future actions regardless of what agency (Federal or non-Federal) or person undertakes such other

actions." *Id.* § 1508.7.

      To satisfy these core requirements, agencies must carefully study the action's

environmental impact. First, the agency can produce a detailed EIS. *Id.* § 1508.11. Not all agency

decisions require such thorough examination, however. When the action does not rise to the level

of "major Federal action," the agency may provide an environmental assessment (EA) instead. *Id.*

§ 1501.4. Nonetheless, EAs still offer a detailed analysis of the action's environmental impact, and

if the agency determines that no significant impact will occur, the EA is sufficient. *Id.*

§ 1508.9(a)(1). An EA must include "brief discussions of the need for the proposal, of alternatives

as required by [42 U.S.C. § 4332(E), and] of the environmental impacts of the proposed action and

alternatives . . . ." *Id.* § 1508.9(b).

      WildEarth makes four central arguments related to BLM's failure to take a hard look at the

environmental impact of the Leasing Authorizations. These distinct areas of concern include:

(1) the failure to consider cumulative climate effects, (2) the failure to incorporate the social cost of carbon methodology, (3) the failure to adequately assess the impact on air quality, and (4) the failure to adequately assess the impact on water quantity and quality. (*See* Doc. 35 at 18–36.)

   a. **BLM sufficiently accounted for the cumulative effect of oil and gas development in the region, and it was not required to use specific climate change methodologies to assess this impact.**

WildEarth argues that BLM did not account for the cumulative environmental effects in conducting the three lease sales. (Doc. 35 at 18.) "The scientific evidence is clear and compelling— climate change is being fueled by the human-caused release of [greenhouse gas (GHG)] emissions, in particular carbon dioxide ($CO_2$) and methane." (*Id.* at 17.) The increase in GHG levels "has been caused by the incremental, collective contribution of emissions from myriad sources . . . ." (*Id.* at 18.) Specifically, WildEarth argues that "NEPA regulations and recent caselaw affirm BLM's obligation to not simply evaluate individual leasing decisions in isolation, but to take into account 'other past, present, and reasonably foreseeable future actions.'" (*Id.* at 19 (quoting 40 C.F.R. § 1508.7).)

At the outset, WildEarth asserts that "BLM's attempts to assess the cumulative climate impacts of its Leasing Authorizations were fundamentally flawed because BLM never considered *any* other 'past, present, or reasonably foreseeable future actions,' including BLM actions, that may cumulatively impact the climate." (*Id.* (quoting 40 C.F.R. § 1508.7).) WildEarth claims that BLM merely took the estimated "GHG emissions from each individual lease sale[] and deemed those direct and indirect emissions alone to constitute a 'cumulative' total." (*Id.* at 19–20 (footnote and citation omitted).) "By considering GHG emissions from the individual lease sales in isolation, BLM ignored the significant cumulative effects on climate from GHG emissions from its leasing activities across New Mexico, the region, and the nation." (*Id.* at 20.) Thus, given the amount of

drilling already occurring on federal land, additional oil and gas development could further push "global warming above the internationally-recognized 1.5 [degrees Celsius] threshold." (*Id.* at 21.) WildEarth states that BLM did not perform a proper cumulative impacts assessment by taking the direct and indirect GHG emissions from each lease sale to calculate total emissions. (*Id.* at 19–20.)

What concerns WildEarth, however, is not simply the percentage of overall emissions that these wells might add to the area, but rather, how this incremental increase might contribute to the global climate crisis. WildEarth believes that "BLM failed to take into account *any* other actions, as NEPA requires." (Doc. 35 at 20 (citing 40 C.F.R. § 1508.7; *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 77 (D.D.C. 2019)).) In particular, WildEarth takes aim at BLM's argument that the "incremental contribution to global GHGs from the proposed action cannot be translated into effects on climate change globally or in the area of this site-specific action." (AR at 006500.) BLM posits that climate change is an "ongoing scientific process. It is currently not feasible to know with certainty the net impacts from the proposed action on climate. While BLM actions may contribute to the climate change phenomenon, the specific effects of those actions on global climate are speculative given the current state of the science." (AR at 001543.) WildEarth reads these claims as a sort of climate denial that permeates through the analysis and necessarily leads to granting these leases.

WildEarth's argument turns on the extent to which it was necessary to quantify how the Leasing Authorizations affect global climate change. For instance, the September 2017 and December 2017 EAs use near identical language to discuss climate change.

> Leasing the subject tracts would have no direct impacts on climate as a result of GHG emissions. However, it is assumed that leasing the parcels would lead to some type of development that would have indirect effects on global climate through GHG emissions. However, those effects on global climate change cannot be determined. (Refer to the cumulative effects section, Chapter 4 for additional

information.)   It is unknown whether the petroleum resources specific to these
leases in the Proposed Action are gas or oil or a combination thereof.

(AR at 001544.) And the September 2018 EA stated the following:

The very small increase in GHG emissions that could result from approval of the
action alternatives would not produce climate change impacts that differ from the
No Action Alternative. This is because climate change is a global process that is
impacted by the sum total of GHGs in the Earth's atmosphere. The incremental
contribution to global GHGs from the proposed action cannot be translated into
effects on climate change globally or in the area of this site-specific action. It is
currently not feasible to predict with certainty the net impacts from the proposed
action on global or regional climate.

(AR at 006500.)

Yet courts both in and out of the Tenth Circuit have offered mixed messages on using

climate change-based data in decisions. Some hold that given the near-impossible exercise of

extrapolating global climate effects from local environmental degradation, agencies need not

specifically tie the environmental impact analysis to climate change. For instance, the D.C. Circuit

held that current modelling cannot directly connect the agency action to effects on global climate

change. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 309 (D.C. Cir. 2013). As such, BLM "was

not required to identify specific effects on the climate in order to prepare an adequate EIS." *Id.*

The GHG emissions figures could "serve as a reasonable proxy for assessing potential climate

change impacts . . . ." *Id.* (citation omitted). Similarly, the District Court for the District of

Colorado held that BLM could still take a hard look at the environmental impact of its actions

despite lacking tools "that would allow [it] to predict how a project's emissions would impact

global, regional, or local climate because, at the time, government agencies did not have

standardized protocols or specific levels of significance by which they could quantify climate

impacts." *Citizens for a Healthy Cmty. v. U.S. Bureau of Land Mgmt.*, 377 F. Supp. 3d 1223, 1239

(D. Colo. 2019) (citation omitted).

17

On the other hand, some courts have implicitly required agencies to incorporate climate science in their analyses—though no court has flatly mandated it. The District Court of Montana, for instance, held that BLM violated NEPA in failing to show minimal cumulative climate effects. *Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, No. CV-18-73-GF-BMM, 2020 WL 2104760, at *10 (D. Mont. May 1, 2020). The Montana court based its ruling on Ninth Circuit caselaw that "requires a catalogue of past, present, and reasonably foreseeable projects." *Id.* at *11 (citing *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971–72 (9th Cir. 2006)). The court acknowledged that greater GHG emissions equate to greater effects on the global climate, but the failure to catalogue simultaneous oil and gas projects in the region formed the true basis for rejecting BLM's leases. *Id.* at *10.

Closer to home, Judge Christina Armijo of the District of New Mexico recently ruled that BLM failed to take a hard look in ignoring the "cumulative effects of [a] proposed action." *San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227, 1248 (D.N.M. 2018). The Court cited Tenth Circuit precedent acknowledging the minimal impact of local activities on climate change, *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1283 (10th Cir. 2016), but questioned BLM's claim that local activities would have *no impact* on global climate change. *San Juan Citizens All.*, 326 F. Supp. 3d at 1248. BLM posited that it properly contextualized its analysis in citing Air Resource Technical Reports—documents describing the relation between air quality and climate change—and concluded that factoring climate data into the analysis would be too difficult on a site-specific basis. *Id.* at 1249. Despite broaching this discussion, the court ultimately formed no opinion on the need for specific climate change analyses. *Id.* Rather, the *San Juan Citizens Alliance* court remanded the case to the agency because BLM failed to include the downstream greenhouse effects. *Id.* at 1250. However, WildEarth did

not raise this issue in the present case because BLM adequately assessed the downstream GHG emissions effects in this instance. (*See* AR at 002722, 001567, 006498.)

Given the inconsistent precedent, the Court largely treats the specific issue of whether to require climate change data in BLM's analysis as one of first impression. Like any new issue, the first place to search for answers is the statutory language. But in reading NEPA, nothing in its text and nothing in its associated regulations specifically mandates that agencies perform a particular analysis or subscribe to a particular methodology. WildEarth relies on NEPA's cumulative impacts provision, which states that agencies must look at the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. As far as the Court can tell, no district has read this provision to require that BLM perform a specific test.

Nevertheless, BLM still provided several examples of how its analyses contextualize GHG emissions in the region and meet NEPA's cumulative impacts requirement. NEPA requires that agencies show:

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (quoting *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006)).

First, BLM places these leases in a regional and national context. This analysis "provides a level of comparison for GHGs associated with oil and gas production and with total national emissions." (AR at 002699.) It roots the analysis in countrywide energy production and applies "production percentages to estimate emissions for the Permian Basin." (*Id.*) Each EA "examined

national and statewide GHG emissions from all sources, and emissions from federal leases in New

Mexico and the Permian Basin region." (Doc. 40 at 16 (citing AR at 002699, 001545, 006498–

99).) BLM calculated the direct and indirect GHG emissions for each lease sale. (*See id.*)

**Table 1: Potential GHG Emissions from the Proposed Lease Sales**[2]

| GHG Emissions Source | Total Emissions (metric tons CO₂e annually) | Percent of U.S. GHGs From All Sources |
|---|---|---|
| Total U.S. GHG Emissions from All Sources | 6,870,500,000 | 100% |
| Total U.S. GHG Emissions from Oil and Gas Field Production | 195,600,000 | 2.85% |
| Total New Mexico Emissions from Oil and Gas Field Production | 8,575,238 | 0.12% |
| Total New Mexico Emissions from Federal Leases | 5,000,970 | 0.07% |
| Total Federal Mineral Estate San Juan Basin Emissions from Oil and Gas Production (16,289 wells for reference year 2014) | 2,550,325 | 0.04% |
| Total Federal Mineral Estate Permian Basin Emissions from Oil and Gas Field Production (17,798 wells) | 2,450,645 | 0.04% |
| **Total Potential GHG Emissions from Oil and Gas Field Production at Full Development (Sept. 2017 Lease—273 wells)** | **37,590** | **0.0005%** |
| **Total Potential GHG Emissions from Oil and Gas Field Production at Full Development (Dec. 2017 Lease—27 wells)** | **3,718** | **0.0001%** |
| **Total Potential GHG Emissions from Oil and Gas Field Production at Full Development (Sept. 2018 Lease—1,099 wells)** | **151,324** | **0.0022%** |

(AR at 002700, 001546, 006497–98.) The 273 wells associated with the September 2017 sale, for

instance, could yield 37,590 metric tons of CO₂e per year. (AR at 002701.) The 27 wells associated

with the December 2017 lease sale could yield 3,718 metric tons of CO₂e per year. (AR at 001546.)

And the 1,099 wells from the September 2018 lease sale could yield a potential 151,324 metric

---

[2] Table compiled from various charts within the administrative record.

tons of $CO_2e$ per year. (AR at 006498.) These figures situate potential cumulative GHG emissions in the context of state and regional oil and gas development. The additional GHG emissions would account for approximately 0.0028 percent of GHG emissions nationally, 2.2 percent of GHG emissions in New Mexico, and about 7.3 percent of GHG emissions in the Permian Basin.[3] This analysis satisfies the first three prongs of the cumulative analysis test, with BLM concluding that the overall impact is minimal, both locally and regionally.

In addition, BLM met the standard for the fourth prong in considering other projects in the region. It is well known that the Greater Carlsbad/Permian Basin region has been home to extensive oil and gas development during the last decade. (AR at 001545, 006496.) BLM accounted for broader development in the region and compared that development to the individual lease sales. (*Id.*) While BLM did not compare each specific project to the other lease sales, the Court finds that BLM's broader comparison to development in the region satisfies the cumulative analysis test.

Finally, while BLM may not have been able to quantify the specific impact on climate change, it did assess the global impact of its leases through incorporation of its Air Resource Technical Reports. (AR at 031402, 018995.) These reports analyze the effects of "climate change and air quality impacts from oil and gas development in four states, including New Mexico." (Doc. 40 at 17 (citing AR at 031402, 018995).) They "discuss and analyze the relationship between climate change, greenhouse gases, and global warming, including summarizing data on the concentration of various GHG and temperature trends over time, and providing a description of

---

[3] Percentages calculated from data provided in Table 1. The potential GHG emissions from the three Leasing Authorizations would total 192,632 metric tons of $CO_2e$ (adding 37,590 (Sept. 2017), 3,718 (Dec. 2017), and 151,324 (Sept. 2018)). Nationally, the Leasing Authorizations would account for 0.0028 percent of the total 6,870,692,632 metric tons of $CO_2e$ (adding the Leasing Authorizations to the national total). In New Mexico, the Leasing Authorizations would account for 2.2 percent of the 8,767,870 metric tons of $CO_2e$ (adding the Leasing Authorizations to the state total). And in the Permian Basin, the Leasing Authorizations would account for 7.3 percent of the 2,643,277 metric tons of $CO_2e$ (adding the Leasing Authorizations to the regional total).

anthropogenic sources of GHG emissions." (*Id.* (citing AR at 031428–32, 019018–22).) Overall, BLM sufficiently analyzed how these leases affect the local and regional environment, and its conclusion that the impact was not significant was not arbitrary and capricious.

> **b. BLM was not required to apply the Social Cost Carbon Protocol in evaluating the three lease sales.**

Next, WildEarth suggests that BLM should have applied the social cost of carbon (SCC) protocol to "quantify [the] project's contribution to costs associated with global climate change." (Doc. 35 at 25 (quotation omitted).) WildEarth states that BLM "was aware of [this methodology] when it issued the Leasing Authorizations, but arbitrarily refused to use this tool." (*Id.*) WildEarth acknowledges that the law does not mandate a particular system to evaluate environmental damage, but it believes that the agency must still explain "its decision to use or forego using an available analytical tool." (*Id.* at 25–26 (citation omitted).)

BLM asserts that it was under no obligation to apply the SCC protocol. (Doc. 40 at 20.) NEPA does not require "that agencies weigh the economic costs and benefits of a proposed action. To the contrary, 40 C.F.R. § 1502.23 specifically provides that agencies need not do so, and in fact should avoid such comparisons when, as here, the NEPA analysis in question involves important qualitative considerations." (*Id.*) While certain quantitative data needs to be analyzed, the "regulations preserve ample decision space for federal agencies to use the metrics and methodologies best suited to the issues at hand, consistent with the broad discretion typically afforded to an agency's choice of methodology." (*Id.* (citation omitted).)

The SCC protocol was "designed to quantify a project's contribution to costs associated with global climate change" and "was created with the input of several departments, public comments, and technical models." *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1190 (D. Colo. 2014) (citation omitted). Nevertheless, the SCC protocol "is

provisional and was expressly designed to assist agencies in cost-benefit analyses associated with rulemakings, but the EPA has expressed support for its use in other contexts." *Id.* (citation omitted). Nothing in NEPA requires this specific tool, but its accompanying regulations caution that evaluating "the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations." 40 C.F.R. § 1502.23. *Citizens for a Healthy Community* held that agencies have "discretion to decide when to analyze an effect quantitatively or qualitatively." 377 F. Supp. 3d at 1240 (citation omitted). But agencies that choose to engage in such techniques cannot offer a misleading picture. *Id.* "An important aspect of *High Country* was the fact that the agencies had attempted to quantify contributions to the costs of global climate change in drafts of their EIS, but then removed that portion" because it was considered controversial. *Id.* at 1241.

Here, BLM points out that the "regulations preserve ample decision space for federal agencies to use the metrics and methodologies best suited to the issues at hand" (Doc. 40 at 20), and the Court agrees. NEPA requires that the agency assess the direct and indirect impact on the environment, and agencies have wide discretion in how to perform those tasks. *Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993). The Court's role is not to dig into which scientific theory or methodology is best, but rather to verify that the minimum statutory requirements have been met. *See id.*; *see also Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. Feb. 19, 2019) (explaining that it was not necessary to use the SCC protocol).

Nevertheless, BLM did not dismiss the SCC protocol out of hand. In response to a comment, the agency stated that:

> Given the global nature of climate change, estimating SCC of an individual decision requires assessing the impact of the project on the global market for the commodity

> in question. While the BLM is able to estimate the GHG emissions associated with
> reasonably foreseeable oil and gas development, this EA does not estimate the net
> effect of this action on global GHG emissions or climate change. Depending on the
> global demand for oil and gas, the net effect of this project may be partially offset
> by changes in production in other locations. Accounting for this potential
> substitution effect is technically challenging.

(AR at 001585.) WildEarth provides several examples of how the SCC protocol would have aided BLM's analysis. It states that the SCC protocol would have been useful for decisionmakers and the public to understand the impacts on global climate change. (Doc. 35 at 25.) While the Court agrees that the analysis could have offered additional evidence, WildEarth points to no authority mandating that BLM perform the SCC protocol. There are an infinite number of tests that could be performed, or studies conducted, prior to this sort of transaction. BLM is not required to perform all of them. BLM explained why it chose not to apply the SCC protocol. It further noted in one report that applying the SCC protocol is "challenging because [the SCC protocol] is intended to model effects at a global scale on the welfare of future generations caused by additional carbon emission occurring in the present." (AR at 006618.) The methods that BLM used satisfy NEPA, and therefore, it did not err in opting not to employ the SCC protocol.

### c. BLM appropriately considered the impact on air quality in approving the three lease sales.

Next, WildEarth contends that "BLM failed to take a hard look at the air quality impacts of lease development . . . ." (Doc. 35 at 29.) The same relationship between the APA, NEPA, and its regulations governs this question of whether BLM properly evaluated air quality in the region before issuing the three leases. WildEarth maintains that BLM "had tools available to calculate potential direct emissions of ozone precursors . . . but arbitrarily and without explanation, chose not to utilize them, despite acknowledging that ozone was 'the pollutant of most concern' in the region." (*Id.* at 30 (citing AR at 002697, 001542, 006495).) BLM "relied on an outdated ozone

24

pollution limit to support its conclusion that additional ozone pollution from its Leasing Authorizations would not cause significant air quality impacts." (*Id.* at 31.) BLM's "use of an outdated, weaker federal standard is not merely fly-specking, but a significant error . . . ." (*Id.*) And finally, BLM failed to consider the cumulative impact of its lease authorizations on air quality. (*Id.* at 32.)

BLM, however, claims that it properly examined how the leases would affect air quality. (Doc. 40 at 23.) Specifically, the EAs discuss air quality in the state, and they reference multiple Air Resource Technical Reports. (*Id.*) These documents "provide lengthy explanation and analysis of the current state of ozone in New Mexico, and nationwide . . . ." (*Id.*) Additionally, BLM maintains that NEPA does not demand that it "place emissions in the context of current ozone levels" at the leasing stage. (*Id.* at 24.) BLM further argues that it properly calculated ozone levels and did not "downplay" the levels as WildEarth suggests. (*Id.*) And finally, BLM posits that it considered the cumulative effects of air quality in assessing the NEPA requirements. (*Id.* at 25.)

The Court first notes that BLM addresses ozone levels in several instances, both in its Air Resource Technical Reports and its EAs. In its 2017 Air Resource Technical Report, for example, BLM discusses ozone levels in the context of volatile organic compounds (VOCs). VOCs "participate in atmospheric photochemical reactions to form secondary pollutants such as ozone which can affect the environment and human health. VOCs are emitted from a variety of sources, such as refineries [and] oil and gas production equipment . . . ." (AR at 018999.) The Air Resource Technical Report states that:

> In Carlsbad, NM, removing the effects of weather, ozone concentrations increased 8% between 2000 and 2012, while ozone concentrations in Farmington, NM decreased 6% from 2000 to 2012. Ozone concentrations in Tulsa, Oklahoma decreased 23% from 2000 to 2015 and in Oklahoma City decreased 18% from 2000 to 2015. Removing the effects of weather, ozone concentrations in Kansas were the

> same in 2012 as in 2000.  In Texas, ozone concentrations decreased substantially
> removing the effects of weather, especially in large urban areas.

(AR at 019000.) This description situates the lease sales in the context of ozone pollution in the

region and neighboring states. The Air Resource Technical Reports also analyzes ozone pollution

in the context of other pollutants:

> An emissions inventory conducted for the Carlsbad Field Office for calendar year
> 2007 and including Chaves, Lea, and Eddy counties (Applied Enviro Solutions,
> 2011) shows that VOC emissions from biogenic (natural) sources are far greater
> than those from anthropogenic (human) sources and account for 91% of VOCs
> inventoried. Point source emissions (which might include such industrial sources
> as power plants, gas plants and oil refineries) account for 40% of anthropogenic
> VOC emissions in the area, solvent use accounts for 15%, and fire (including
> wildland, structure, and open burning) accounts for 8%. Oil and gas area sources
> produce only 1.4% of VOCs in the area while pipeline transport of oil and gas
> accounts for 1.7%.

(AR at 018929.) Based on this, BLM concluded that oil and gas development in the region had a

minimal impact on ozone pollution. Moreover, BLM tracked the number of days where the air

quality index exhibited dangerous levels of pollutants to sensitive populations. (AR at 002679,

001528, 006601.) This discussion suggested that the days posing danger showed no discernible

pattern and were not tied to any aspect of oil and gas production. (*Id.*) With that, BLM concluded

that the Leasing Authorizations would not have a significant impact on these indicators.

BLM next argues that at the leasing stage of development, too much uncertainty exists, and

estimating accurate air quality figures proves difficult. The "degree of impact will also vary

according to the characteristics of the geologic formations from which production occurs.

Currently, it is not feasible to directly quantify emissions . . . ." (AR at 002697.) While ozone

might be of great concern to BLM, any additional $NO_2$ and VOCs added as a result of development

from the three leases "are likely too small to have a significant effect on the overall ozone levels

of the area." (*Id.*) The Court agrees that BLM "satisfied NEPA's requirements by placing

emissions in the context of current ozone levels and determining that emissions from development on the lease parcels would not have a significant effect." (Doc. 40 at 24 (citing AR at 002697, 001542, 006495).)

Finally, despite WildEarth's contentions that BLM did not address ozone levels, BLM discussed National Ambient Air Quality Standards (NAAQS) in detail in each of the EAs. NAAQS are standards on atmospheric concentration related to six pollutants, including ozone. BLM determined that the region currently satisfied national NAAQS standards. (AR at 002697, 001527, 006600.) Each of the NAAQSs were within the guideline ranges, and the new development in the region would not bring NAAQS outside acceptable levels. Taking all this, the Court believes that BLM took a hard look at air quality during its analysis.

### d. BLM appropriately considered the impact on water quantity and quality in approving the three lease sales.

Lastly, WildEarth suggests that BLM "failed to assess the cumulative impacts on water resources resulting from development of the challenged leases, when added to other cumulative water uses in the Greater Carlsbad region." (Doc. 35 at 33.) Oil and gas development threaten groundwater resources, and "BLM's cursory conclusion—that groundwater pollution will be minimized by design measures—is belied by the record, which shows that fracking fluids are already entering area aquifers . . . ." (*Id.* at 34 (citations omitted).) Despite BLM's promise that oil and gas development is safe, certain byproducts have entered the local groundwater. (*Id.*) Additionally, BLM did not asses the cumulative impact of such development on the holistic groundwater system, and development in the "next 20 years will more than double the oil and gas industry's regional water usage . . . ." (*Id.* at 35.)

BLM holds that it "analyzed the use of groundwater and the potential impacts of the lease sales on water *quantity*." (Doc. 40 at 25.) This involved placing these lease sales in the context of

other oil and gas development operations in the region and recognizing the impact on water levels. Moreover, BLM performed substantial analysis to ensure that the quality of water was not diminished by oil and gas development.

### i. Water Quantity

In New Mexico, water is a scarce resource. It has many personal and household uses, in addition to industrial uses such as oil and gas development, agriculture, and livestock maintenance. BLM acknowledges that the "water used for hydraulic fracturing in the [Pecos District] generally comes from permitted groundwater wells. Because large volumes of water are needed for hydraulic fracturing, the use of groundwater for this purpose might contribute to the drawdown of groundwater aquifer levels." (AR at 002704.) But to place water usage in context, agriculture accounts for nearly 86 percent of usage in the Pecos District. (AR at 006568.) The public water supply accounts for another 6 percent. (*Id.*) Meanwhile, mining, power, oil and gas development account for about 2 percent of water usage in the region. (*Id.*) And in New Mexico, within that particular category, oil and gas development accounts for only 5.4 percent (of that 2 percent). (AR at 006569.)

To calculate the impact on the water supply, BLM issued a reasonable foreseeable development report listing current water usage. Based on the wells that would materialize from these leases, it projected water usage on a 20-year basis, using the acre-foot (AF) measurement. (AR at 006570–72.) BLM projected that the yearly average use would generate "a 1638 AF increase over the 2244 AF" in the original report, "for a total of 3882 AF for the Oil and Gas Industry." (AR at 006571.) The high-end scenario that BLM estimated would increase usage to

28

4,988 AF per year. (AR at 006572.) This would potentially increase oil and gas usage from 5.4 percent to 9–11 percent across the state.[4] (AR at 006571–72.)

Again, this increase in water usage makes up a fraction of total usage, as compared to agriculture and public water consumption. Specifically, BLM concluded that the water usage in the Pecos District would only increase by approximately 0.4 percent—as compared to all other uses.

BLM took a hard look at the issue of water quantity in the region, and because "the percentage of water use for these lease sales is such a small portion of the overall usage in the PDO, BLM does not expect the new development to have a significant impact on ground and surface water resources in this area." (AR at 006574.) Therefore, BLM's decision to proceed despite the minor increase in water usage was not arbitrary and capricious.

### ii. Water Quality

WildEarth also takes issue with BLM's analyses of water quality and how the lease sales would affect water quality in the region. First, BLM analyzed the "casing specifications" for the wells resulting from the new leases. BLM acknowledged that,

> Contamination of groundwater could occur without adequate cementing and casing of the proposed well bore. Casing specifications are designed and submitted to the BLM. The BLM independently verifies the casing program, and the installation of the casing and cementing operations are witnessed by certified Petroleum Engineering Technicians. Surface casing setting depth is determined by regulation. Adherence to APD COAs and other design measures would minimize potential effect to groundwater quality.

(AR at 002704.) BLM further recognized the risks involved in hydraulic fracturing. For instance, if "the well location was proximate to water sources a potential impact to the waters could arise due to the chemicals being used during the hydraulic fracturing process." (*Id.*) Nevertheless, BLM

---

[4] This percentage change is within the mineral and gas category that only accounts for two percent of total water usage in the region.

noted that site-specific analyses are later performed during the APD stage of development, not the lease issuance stage. (*Id.*)

Next, BLM analyzed the tests related to groundwater and runoff resulting from the new leases. Given the increased oil and gas development in the region, BLM initiated a pilot tracer dye study in 2007 to

> determine if contaminates could enter the ground water through drilling and cementing operations, or during later phases of production or abandonment in the event of casing failure.  Any positive results from the dye tracing study would then indicate that the BLM in conjunction with the oil and gas industry needs to ensure that all possible down-hole mitigation measures are being taken to protect these vital water resources.

(AR at 021317.) This test involves placing a small amount of dye into the system on a regular basis. Researchers then test for the dye at various downstream locations. If dye is present, it indicates that there may be problems with the process or casing that allows material out of the well's vicinity.

BLM initially concluded that "drilling fluids do enter the aquifers." (AR at 021319.) The results indicated that some dye was released downstream of the wells, but not in serious quantities.[5] (AR at 021318.) The study showed that "there are no 'solid' positive (+), very positive (++), or extremely positive (+++) concentrations of dye detected in any of the dye receptor locations." (AR at 021318.) Yet BLM also posited that further study was still needed given the trace amounts of dye found. It stated that the low levels may have been due to "the increased dilution of the dyes as they move into the aquifers. A second possibility is that once the drilling operation loses circulation into the first open zone all or most of the drilling fluid and dye are lost into that zone." (*Id.*) Still

---

[5] The tracer dye study produced varied results from site to site. "After 16 ounces of dye were introduced to the drilling fluids[,] the Able water well came back with a detectable concentration of Eosine of .952 ppb[,] which is nearly 2 orders of magnitude greater than the previous background concentration of .042." (AR at 021318.) This indicated a connection between the wells and increased chemicals in the area. Two other wells in the region showed similar increases, while three others showed no measurable increases in the levels. (*Id.*)

the broader conclusion drawn from this pilot program is that good management practices and testing can help prevent local contamination.

Oil and gas development can pose a risk to nearby aquifers. The Court, however, will not take these scientific findings and furnish its own opinion on potential contamination. Rather, its role is to determine whether BLM took a hard look at water quality and the potential impact of newly added wells in the region. In evaluating these extensive studies, the Court believes that BLM took a hard look and satisfied NEPA's requirements.

**IV.      BLM Reasonably determined that no EIS was needed.**

WildEarth next argues that BLM failed in only preparing EAs to justify the lease sales, instead of the more extensive EISs. (Doc. 35 at 38.) If an agency is unsure whether its decisions constitute a "major Federal action[ ] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), the agency may prepare an EA, *see* 40 C.F.R. § 1501.4(b). An EA "provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or[,]" alternatively, "a finding of no significant impact[,]" *id.* § 1508.9(a)(1). If the EA concludes that the agency action will "not have a significant effect on the human environment[, an EIS] will not be prepared." *Id.* § 1508.13. The agency can determine that no EIS is necessary if the action fits within a categorical exclusion. *Id.* § 1508.4. A categorical exclusion is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in [NEPA] procedures adopted by a Federal agency . . . ." *Id.* § 1508.4; *see also Diné Citizens Against Ruining Our Env't v. Jewell*, 312 F. Supp. 3d 1031, 1078–79 (D.N.M. 2018), *aff'd in part, rev'd in part and remanded sub nom. Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019), *reh'g denied* (June 24, 2019). The significance of the environmental impact turns on the "context" and "intensity." 40 C.F.R. § 1508.27. Context

addresses the action's impact on everything from the local area, to the region, to society as a whole. *Id.* § 1508.27(a). Intensity refers to a list of enumerated factors that the agency must assess. *Id.* § 1508.27(b).

WildEarth states that "BLM failed to explain why the Leasing Authorizations' direct, indirect, and cumulative impacts to climate and natural resources are not significant, taking into account context and intensity." (Doc. 35 at 38.) That is, "BLM never explained how, in this particular context, new oil and gas development—resulting in additional GHG and ozone pollution, increased risk of groundwater contamination, and the extraction of 'large volumes of water'—was insignificant." (*Id.*) At base, WildEarth's argument rests on the points made earlier—that BLM should have considered the cumulative effect of development on the environment. (*Id.*) As a result, BLM should have presented documentation beyond an EA to support its decision to issue leases in a region already undergoing unprecedented oil and gas development. (*Id.*)

Contrary to WildEarth's claims about it neglecting the contextual features of the region's oil boom, BLM "did consider the lease sales in context with other oil and gas development in the Permian basin, the State of New Mexico, and the entire United States." (Doc. 40 at 28 (citations omitted).) BLM states that an EIS is only needed when the effects of a lease sale are "highly uncertain." (*Id.* (citing *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009)).) "Any uncertainty goes not to the effect of the lease sales—*i.e.*, the quantity of the GHG emissions resulting from the lease sales and the fact that those emissions contribute to climate change—but rather to the precise impact of those GHG emissions on climate change." (*Id.* at 29.) As a result, BLM asserts that no EIS was needed.

Here, BLM prepared EAs for each of the three leases at issue. The Court earlier noted that these documents were adequately prepared and properly analyzed the direct and indirect effects

related to oil and gas development in the region. These documents contextualized the new leases within the local area, within New Mexico, and within the United States broadly. On each front, BLM drew conclusions that showed how these three lease sales would not significantly impact the environment.

Section 1508.27 defines what level of impact is required to warrant an EIS, listing a variety of indicators that may show the significance of the environmental impact. Throughout BLM's EAs, it continually held that the impact will be minimal and adequately supported such findings. For instance, one "intensity" factor asks how the agency's action "affects public health and safety." 40 C.F.R. § 1508.27(b)(2). The Court largely addressed these concerns in the previous section, but to review, BLM stated that it takes extensive measures to ensure that the wells are properly secured, and that it is still testing in the region to ensure that fracking byproducts are not making their way to groundwater resources. (*See* AR at 002704.) Any impact on the quantity and quality of water resources would be minimal. Further, BLM carefully assessed the air quality in the region and determined that these leases would have an insignificant impact in terms of GHG emissions, relative to the rest of the region's oil and gas development. (*See* AR at 002720–21.) Moreover, any issues with air quality have not been tied to oil and gas development specifically, and there is no marked increase in the number of days in the region that show poor air quality. (AR at 002679, 001528, 006601.)

Next, BLM looked at the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). BLM assessed the leases' imposition on cultural resources, Native American religious land, and paleontological resources, determining that these leases did not affect such sites. (*See* AR at 002680–82.) And the EAs suggest that if

through their drilling they were to encounter sites of cultural or historical significance, "construction would be delayed until salvage efforts are undertaken." (*See* AR at 002703.)

Finally, section 1508.27 also looks at whether the action is "highly controversial" or presents "unique or unknown risks." 40 C.F.R. § 1508.27(b)(4)–(5). Per the earlier discussion, the Court recognizes that climate change can elicit strong reactions. But the Court also notes that nothing in NEPA or its accompanying regulations mandates certain studies to account for this global problem. What should not be controversial is the Court's role in holding agencies accountable to congressional mandates. If Congress requires BLM to perform specific climate change-based studies, then the Court will uphold them. That time has not yet arrived. At present, BLM states that extrapolating site-specific leasing emissions onto global climate models is too uncertain. Instead, it places emissions in the context of the locality and region. Such analysis meets NEPA's requirements and is not controversial despite the charged nature of the topic. In reviewing section 1508.27, the Court holds that BLM adequately addressed the various considerations in its EAs. As a result, the agency was not required to prepare EISs for each of the three lease sales.

## V.    WildEarth has standing to challenge IM 2018-034.

Next, API and WEA argue that WildEarth specifically lacks standing to challenge IM 2018-034. (Doc. 38 at 30.) "Under Article III of the United States Constitution, federal courts only have jurisdiction to hear certain 'Cases' and 'Controversies.'" *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543 (10th Cir. 2016) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014)). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citation omitted). "Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must show an injury-in-fact, or rather "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (quotation marks and citation omitted). Next, "there must be a causal connection between the injury and the conduct complained of . . . ." *Id.* (citing *Simon v. Eastern Ky. Welfare Rights Org*, 426 U.S. 26, 41–42 (1976)). And finally, the injury must be redressable through a favorable decision. *Id.* at 561.

### a.  Injury-in-Fact

API mischaracterizes WildEarth's challenge, describing it in the following manner: "Plaintiff alleges that, going forward, IM 2018-034's provisions governing public participation in BLM's process for NEPA review of oil and gas leasing will make it more difficult for Plaintiff to pursue its 'goal . . . to ensure that BLM is engaging in informed decisionmaking . . . ."[6] (Doc. 38 at 43 (citing Doc. 35-3).) API believes that granting an advocacy group standing "to challenge government policy with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement." (*Id.* (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005)).) To support this claim, API states that WildEarth "has alleged no facts demonstrating a cognizable injury to its interests." (*Id.* at 34 (footnote omitted).)

The Tenth Circuit has held that "the injury of an increased risk of harm due to an agency's uninformed decision is precisely the type of injury [NEPA] was designed to prevent[,]" thus forming the basis for injury in fact under Article III. *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448–49 (10th Cir. 1996). The second prong of the test demands that "the increased risk

---

[6] API and WEA largely present the same arguments against standing. For ease, the Court cites API's brief but addresses the concerns of both trade organizations.

of harm injures the plaintiff's concrete interests," and "the litigant must establish either its 'geographical nexus' to, or actual use of the site where the agency will take or has taken action such that it may be expected to suffer the environmental consequences of the action." *Id.* (quoting *Douglas Cty. v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995)) (subsequent citation omitted).

Beyond a mere detriment to its advocacy, WildEarth argues that its members "are directly harmed by BLM's Leasing Authorizations and IM 2018-034." (Doc. 35 at 14.) Specifically, members "work in the Greater Carlsbad region documenting pollution in the oil and gas fields . . . ." (*Id.*) WildEarth offers three declarations from members describing how each enjoys the tracts of land at issue in this suit. For instance, Nathalie Eddy is a WildEarth member. (Doc. 35-1 ¶ 4.) Eddy works in the Greater Carlsbad area, analyzing air pollutant emissions and serving as a resource to the community on environmental issues. (*Id.* ¶ 7.) Eddy visited the region on multiple occasions beginning in March 2018. (*Id.* ¶¶ 13–17.) Additionally, another WildEarth member, Rebecca Sobel, declared that she has lived in New Mexico for 15 years. (Doc. 35-2 ¶¶ 2–3.) She too worked in Greater Carlsbad and started visiting the region in September 2006 (*id.* ¶ 10) and specifically visited the parcels at issue in the September 2018 lease sale (*id.* ¶¶ 33–36). Since then, she has visited the region numerous times. (*Id.*) Finally, WildEarth member Rebecca Fischer declared to have worked on environmental projects in the region, though the details of her visits and experiences are not expressed with a level of detail on par with Eddy and Sobel. (Doc. 35-3.)

API focuses on the actual scientific work performed in the region, suggesting that it is only related to the organization's advocacy and cannot constitute injury-in-fact. (Doc. 38 at 43–44.) But the declarations from WildEarth's members go beyond mere advocacy, describing their recreational enjoyment and the impact of oil and gas development on those activities. Eddy states that in areas where "oil and gas development exists, it is always very noticeable. I find it offensive

to observe and be exposed to the sights, sounds, and smells of oil and gas development . . . ." (Doc. 35-1 ¶ 22.) Sobel declared that she visits Carlsbad Caverns National Park "at least once every three years to enjoy its subterranean wonders and above-ground beauty." (Doc. 35-2 ¶ 12.) Moreover, she is "also very interested in the bat colonies of [Carlsbad Caverns]" and enjoys "visiting the Guadalupe Mountains." (*Id.* ¶¶ 12–13.) She enjoys viewing the "scenery" and the "unique" wildlife in the region. (*Id.* ¶ 13–14.) Sobel notes that where the oil industry exists, "it is always very noticeable and detracts from the natural beauty of the region. I find it offensive to observe and be exposed to [the] sights, sounds, and smells of oil and gas development detract from the natural scenery of the region, and decrease my enjoyment . . . ." (*Id.* ¶ 16.) And beyond a discussion of the region, Sobel discussed her experience on lands associated with each of BLM's three lease sales. (*See id.* ¶¶ 24–36.)

Thus, while these WildEarth members performed scientific functions along with their advocacy, each declared that they personally enjoyed southeastern New Mexico's scenic and natural beauty. Interference with such enjoyment would sufficiently constitute injury to the plaintiff. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Or rather, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).Yet courts must proceed with caution and not overextend this principal to all manners of environmental degradation. For instance, *Lujan* warned: "[t]hat the [plaintiffs] 'had visited' the areas of the projects before the projects commenced proves nothing," and vague intentions to visit the land in the future fail to meet the test for "'actual or imminent' injury that our cases require." 504 U.S. at 564 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

But here, the WildEarth members visited the land on numerous occasions, both before and after the parcels were sold. Take Eddy for example. She worked in the area on multiple occasions after the lease sales (March 2018, August 2019, and November 2019). (Doc. 35-1 ¶ 13–15.) She also stated that she had definite plans to return as well (March 2020, April 2020, and quarterly thereafter). (*Id.* ¶ 16.) Sobel too worked in the region before and after the lease sales, with plans to return in October 2020. (Doc. 35-2 ¶ 10.) This specificity is far beyond what *Lujan* demands. *See* 504 U.S. at 564. As a result, the Court believes that WildEarth offers ample evidence of injury-in-fact.

### b. Causation

WildEarth states that in NEPA cases, plaintiffs are only required to show that the harm derives from the agency's failure to follow NEPA. (Doc. 35 at 15 (quoting *Lucero*, 102 F.3d at 452).) BLM's alleged failure to take a hard look at the environmental impact caused the injuries to WildEarth. API does not directly contest the causation issue.

### c. Redressability

Finally, API argues that assuming WildEarth could establish injury-in-fact, it could not establish "that a favorable decision by this Court is likely to redress that harm." (Doc. 38 at 45.) WildEarth believes that BLM will revert to its pre-IM 2018-034 practices, but API suggests that "Plaintiff offers no legal or factual basis for that statement." (*Id.* at 46.) API believes that BLM's prior guidance (IM 2010-117) suffers from the same procedural defects, leaving BLM with no guidance to fall back on. Further, "there is 'no guarantee' that BLM's future leasing process following a decision by this Court invalidating IM 2018-034 will include the public participation provisions that Plaintiff prefers." (*Id.* at 47.) WildEarth on the other hand asserts that a favorable decision "could lead to denial of some or all of the challenged leases, or to modifications that

would lessen GHG pollution, air and water pollution, and other environmental impacts." (Doc. 35 at 15 (citations omitted).) That is, a favorable decision would ensure that BLM does not overlook the environmental issues at play.

The Court sides with WildEarth. Because its members have offered evidence proving their enjoyment of the land, they are harmed when NEPA is not followed, and WildEarth alleges that IM 2018-034 violates NEPA and FLPMA. Showing such a violation could result in vacating certain leases, and an overall reduction in GHG emissions. That redress would increase members' enjoyment of the land. Therefore, the Court believes that WildEarth has standing to challenge IM 2018-034, so the Court will address the parties' arguments on the merits.

## VI.   IM 2018-034 did not constitute a final agency action because it did not affect legal rights and obligations.

WildEarth's final argument involves IM 2018-034 and whether it constitutes a final agency action. WildEarth requests that the Court vacate the September 2018 leases that were the subject of BLM's updated policy guidance. WildEarth first argues that BLM's adoption of IM 2018-034 violated FLPMA and NEPA. (Doc. 35 at 42.) WildEarth relies on the issue of public participation to allege that IM 2018-034 is invalid. The FLPMA states that the Secretary "by regulation, shall establish procedures . . . to give . . . the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1739(e). Likewise, NEPA demands public participation in the process. 40 C.F.R. § 1500.2(d). As a result, "BLM's adoption of IM 2018-034, without undergoing formal rulemaking procedures, violated FLPMA Section 309(e), which requires that procedures for public involvement in the management of public lands be established 'by regulation.'" (Doc. 35 at 45 (citing 43 U.S.C. § 1739(e)).) WildEarth asserts that because IM 2018-034 removes some public participation

requirements, it violates U.S.C. § 1739(e) and is thus invalid. BLM, however, states that the agency "already established public involvement procedures for its leasing program 'by regulation.'" (Doc. 40 at 36 (citing 43 C.F.R. §§ 3120.3-2, 3120.4-2, 46.235).)

According to the APA, a plaintiff seeking judicial review must "(i) identify some final agency action and (ii) demonstrate that its claims fall within the zone of interests protected by the statute forming the basis of its claims." *Catron Cty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (quotation marks and citation omitted). The finality of agency action, however, is not always clearly discernable. Clear legislative actions require the agency to use notice-and-comment rulemaking under the APA. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 477–79 (2001) (discussing a reviewable interpretive rule). But an "agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy" not subject to the same lengthy process. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014)

The Supreme Court's test for finality has two parts. The first prong demands that the action "mark[s] the consummation of the agency's decisionmaking process," and the second requires that it is an action "by which rights or obligations have been determined, or from which legal consequences will flow . . . ." *Bennett v. Spear*, 520 U.S. 154, 1778 (1997) (quotation marks and citations omitted); *see also Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173–74 (10th Cir. 2000) (reaffirming the standard). "Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of [the APA]." *Colo. Farm Bureau Fed'n*, 220 F.3d at 1173 (citations omitted).

### a.   Consummation of decision-making process

WildEarth argues that IM 2018-034 amounted to a final decision by BLM. To support this point, WildEarth largely relies on reasoning drawn from *Western Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1239 (D. Idaho 2018) [hereinafter *WWP*]. WildEarth argues that the language in the IM is "more edict in nature," as opposed to tentative. (Doc. 35 at 44 (quoting *WWP*, 336 F. Supp. 3d at 1225).) This tone suggests a finality to BLM's procedures. (*Id.*) At the same time, BLM asserts that "IM 2018-034 makes no decisions as to any particular parcels and leaves BLM staff with considerable discretion to determine the appropriate procedures for a given parcel." (Doc. 40 at 33.)

While the analysis in *WWP* is helpful and persuasive, the Court will diverge on a few key points. Initially, the Court believes that IM 2018-034 reflects the consummation of the decision-making process. One need only look at the language in the document to draw the same conclusion. First, the purpose of IM 2018-034 is to "simplify and streamline the leasing process to alleviate unnecessary impediments and burdens," and it "supersedes existing policy announced in IM No. 2010-117 . . . ." (AR at 012477.) It further "replaces any conflicting guidance or directive found in the BLM Manual or Handbook." (*Id.*) IM 2018-034 next states that it "addresses land use planning, lease parcel review, lease sales and lease issuance, and IM implementation; and . . . directs the BLM to incorporate the revised policy, as appropriate, into affected BLM handbooks and manuals." (*Id.*) Finally, the IM states that the "policy is effective immediately." (AR at 012480.)

All of this language has an air of finality to it. Words like *supersede* and *replace* suggest that the new IM is meant to act as BLM's new guiding document. Nothing in the memorandum suggests that BLM is still sorting through its own policies to make final determinations. And

concluding that the IM is "effective immediately" suggests that no additional policy formulation is necessary before agency employees follow the guidance. According to Black's Law Dictionary, "effective" should be taken to mean "in operation at a given time," especially with regard to "a statute, *order*, contract, etc." "Effective," Black's Law Dictionary (8th ed. 2004) (emphasis added). Given this language and the presentation of the memorandum, the Court believes that IM 2018-034 is the consummation of the agency's decision-making process.

### b.  Legal Rights and Obligations

Next, WildEarth suggests that IM 2018-034 imposes certain obligations and legal consequences. (Doc. 35 at 44.) The updated IM "expressly changes how BLM conducts its oil and gas leasing." (*Id.* (quoting *WWP*, 336 F. Supp. 3d at 1227).) The major substantive changes include reducing parcel review to six months, where no limit previously existed. (AR at 012478.) Public participation now appears discretionary, as opposed to required. (AR at 012479.) And where there previously was a 30-day protest period, IM 2018-034 reduced that to 10 days. (AR at 012480.) As a result, IM 2018-034 has practical effects on the ability of the public, including WildEarth, to participate in BLM's oil and gas leasing process. (Doc. 35 at 44.)

BLM, however, holds that IM 2018-034 "determines no rights and obligations. IM 2018-034 operates entirely within the framework of existing statutes and regulations, including NEPA, FLPMA, and the Mineral Leasing Act . . . ." (Doc. 40 at 33.) "Any legal rights and obligations flow from those statutes and regulations, not from the IM, which merely guides their implementation." (*Id.*) BLM further notes that the *WWP* decision is misguided, and the changes between the two IMs "conform to BLM's existing regulations, and none have a direct or immediate impact on Plaintiff or create new legal rights or obligations." (*Id.* at 34.)

42

To determine whether certain rights and legal obligations were altered, the Court first looks to a recent Supreme Court case for guidance. In *Perez v. Mortgage Bankers Ass'n*, the Court held that, "[n]ot all 'rules' must be issued through the notice-and-comment process. Section 4(b)(A) of the APA provides that, unless another statute states otherwise, the notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" 575 U.S. 92, 96 (2015) (quoting 5 U.S.C. § 553(b)(A)). Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (internal quotation marks and citations omitted). Agencies may alter and amend their interpretive rules outside the notice-and-comment rulemaking process, as long as they do not "'amend' the regulations to which they refer." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015). In *Huerta*, the FAA amended a policy regarding the use of personal electronic devices on airplanes outside of notice-and-comment rulemaking. *See id.* But the FAA made these changes within the existing statutory and regulatory framework. *See id.* Notice-and-comment rulemaking is required when there is a legislative rule, which has come to mean an "action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule." *McCarthy*, 758 F.3d at 251–52.

The Court takes these decisions to suggest that notice-and-comment rulemaking is required whenever a legislative rule exists or when an agency attempts to alter existing regulations. Here, WildEarth takes issue with several facets of IM 2018-034. Concretely, it argues that BLM's new limitation to a 60-day review period and the shortening of the protest period from 30 days to 10 days, alter legal rights and obligations. The Court disagrees. Regarding the 60-day deadline, the Court believes that this change is purely an internal deadline. Where IM 2010-117 stated that it

wanted to "allow each field office to devote sufficient time and resources to implementing the parcel review policy," IM 2018-034 desired to limit this review process to six months—in line with its stated goal of streamlining development. (AR at 012103.) This internal change did not alter existing BLM regulations or laws, and it did not even affect third parties—only BLM internal procedures. Moreover, IM 2010-117 was constructed outside the notice-and-comment rulemaking process and thus, no special deference should be shown to its provisions. The changes at issue merely reflect the differing priorities of two administrations, and it is not the Court's role to judge or overturn such preferences.

As to the shift from a 30-day protest period to a 10-day protest period, the Court recognizes that neither NEPA nor FLPMA requires a protest period at all. Thus, no legal rights or obligations flow from this change. No laws or regulations needed altering to shorten the timeline. Additionally, *McCarthy* defined a legislative rule as one that affected the rights of the individual or organization seeking access to a permitting process, not necessarily those opposed to a permitting process. *See* 758 F.3d at 251–52. As such, the Court believes that this change is allowed to be made outside notice-and-comment rulemaking.

The final issue regarding the rights and obligations of the parties concerns the changes made to public participation. Where IM 2010-117 stated that "field offices *will* provide for public participation as of the review of parcels identified for potential leasing," IM 2018-034 altered that language to "*may*." (*Compare* AR at 012105, *with* AR at 012479.) The Court does take issue with this change. The *Huerta* court makes clear that alterations to existing regulations must undergo notice-and-comment rulemaking. *See* 785 F.3d at 713. FLPMA reads that "the Secretary, by regulation, *shall* establish procedures . . . to give . . . the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation

and execution of plans and programs for, and the management of, the public lands." 43 U.S.C.A. § 1739(e) (emphasis added). In addition, this change in IM 2018-034 violates several associated FLPMA and NEPA regulations. *See* 43 C.F.R. §§ 3120.3–2; 3120.4–2; 46.235; 46.305; 46.435.

Nevertheless, the Court acknowledges that BLM abided by the statutory requirements to include the public in the September 2018 lease sale. That is, even if IM 2010-117 still guided agency action, BLM would have been compliant. BLM sought feedback from the public in April 2018 during its scoping period (AR at 006470), and it listed the parcels that were available in the sale. Plaintiff and others provided comments during this period. Additionally, BLM allowed for public participation during the 10-day protest period, in which WildEarth participated. (AR at 005849, 005181.) The Court believes that these actions stayed within NEPA and FLPMA's regulatory parameters.

Given the minor language alteration in IM 2018-034 and BLM's compliance, the Court believes that vacating the leases is a gross over-exaggeration and a mark of judicial overreach. Vacating these leases would result in shutting down 31 wells and New Mexico returning hundreds of millions of dollars. (Doc. 40 at 43.) IM 2018-034 is by and large an expression of BLM's internal policies and procedures. It does not purport to deviate from established laws and regulations, but rather to alter some of the agency's internal policies and procedures to expedite the leasing of federal land for oil and gas development. The Court's only issue with IM 2018-034 is language that changed "*will* provide for public participation" to "*may* provide for public participation." (AR at 012105, 012479.) The Court believes that the alteration does not warrant a sweeping injunction when: (i) the rest of the IM abides by the guardrails of NEPA, FLPMA, and their regulations and (ii) this particular lease sale provided for public participation.

District courts have broad discretion to "fashion[ ]appropriate remedies." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 770 (1976). As such, the Court will not enjoin IM 2018-034 and halt BLM's entire federal lands leasing process. However, the Court will strike the discretionary language and remind BLM that the law requires public participation in the process under NEPA, FLPMA, and their companion regulations. Any desire to take the public out of the process must go through Congress as it pertains to NEPA and FLPMA or through notice-and-comment rulemaking with regard to their implementing regulations. The Court would only enjoin actions that failed to adhere to the current standards of public participation (none at issue in this case). The Court urges BLM to alter this language in IM 2018-034 to make it consistent with the NEPA, FLPMA, and their regulations. A simple reversion to the language in IM 2010-117 would suffice. Therefore, the Court will grant the motion in part and deny in part.

**VII.    Attorney Fees**

Part of the relief WildEarth requests is for attorney fees and other expenses provided by law. Given that the Court is denying the vast majority of the relief requested, the Court does not believe that awarding WildEarth attorney fees is appropriate.

**VIII.   Conclusions**

To review, the Court recognizes that the Carlsbad and Permian Basin region is now one of the largest oil and gas development regions in the country. As such, this growth will provoke strong reactions from those who see it as an economic boon to the area, and those who believe that the oil and gas industry is a threat to the environment. Amid these tensions, the Court has a simple role: to apply the law as it stands, without comment on the underlying policies. Taking this into account, the Court draws the following conclusions from WildEarth's requested relief:

46

A.  The Court **DENIES** WildEarth's request to declare the Leasing Authorizations in violation of NEPA, FLPMA, the APA, and their implementing regulations;

B.  The Court **DENIES** WildEarth's request to vacate the Leasing Authorizations;

C.  The Court **DENIES** WildEarth's request to enjoin further leasing authorizations within the Pecos District;

D.  The Court **GRANTS** WildEarth's request to enjoin subsequent leases that do not allow for public participation, per IM 2018-034, but the Court **DENIES** WildEarth's request to universally enjoin further development;

E.  The Court **DENIES** WildEarth's request to declare IM 2018-034 unlawful under FLPMA, NEPA, the APA, and their regulations; and

F.  The Court **DENIES** WildEarth's request for attorney fees.

**THEREFORE**,

**IT IS ORDERED** that WildEarth's Motion for Vacatur (Doc. 35) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that the case is **DISMISSED** with prejudice.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**